## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF MISSISSIPPI
## GREENVILLE DIVISION

**DR. WILLIAM (BILL) HAYS**          **PLAINTIFF**

**VS.**          **CIVIL ACTION NO. 4:14-cv-148-GHD-JMV**

**WILLIAM N. LaFORGE, in his official
capacity as President of Delta State University
and in his individual capacity**          **DEFENDANT**

**JURY TRIAL REQUESTED
ON STATE CLAIMS**

### SECOND AMENDED COMPLAINT

**PLAINTIFF HAYS** states his cause of action for injunctive relief and attorney fees and expenses pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988 for violation of his rights, privileges and immunities under the United States Constitution, Amendments 1 and 14, as well as for compensatory and punitive damages for claims under Mississippi common law, as follows:

### I.

### JURISDICTION AND VENUE

1. Jurisdiction of this court is proper pursuant to 28 U.S.C. §§1331 and 1343. Venue in this court is appropriate under 28 U.S.C. §1391(b). Supplemental jurisdiction of Plaintiff's state common law claims is proper under 28 U.S.C. § 1367(a)

### II.

### PARTIES

**2.** Plaintiff Hays is an adult resident citizen of Boliver County, Mississippi. He is a Professor of English at Delta State University, Cleveland, Mississippi.

1

3. Defendant William N. LaForge is the President of Delta State University and an adult resident citizen of Boliver County. He is sued in both his official and individual capacities. He has been served with process in both capacities—that is, in his official capacity on Plaintiff's federal claim and in his individual capacity on Plaintiff's state common law claims.

### III.

### FACTS

4. Plaintiff has been an employee of Delta State University since August, 1981. Until July 1, 2014, Professor Hays had served for many years as Chair of the Division of Languages and Literature. That position carried a salary enhancement to his teaching salary.

5. By letter of May 22, 2014, Paul Hankins, Interim Dean of the College of Arts and Sciences, advised Professor Hays that he would not be reappointed to the administrative office of Chair of the Division. Dean Hankins was simply the messenger. The decision-maker was Defendant President LaForge.

6. Hankins gave no explanation for the termination.

7. When Plaintiff Hays approached the Interim Dean for an explanation, he would give none, but repeatedly said, "It's not for cause. It's not for cause."

8. Plaintiff Hays regularly received top ratings on annual evaluations.

9. Over the years Plaintiff Hays demonstrated a deep commitment to advocacy for all faculty, not just those in his Division, as well as for all students, not just those within his Division. He also routinely sought transparency of University financial matters, including access by the public at large to the University budget.

10. Hays' efforts on behalf of all students and faculty, for academic freedom and fairness, as well as for public access to the budget and transparency of University administration decisions, frequently put him at odds with University administrators.

11. Specifically, Dr. Hays acted in the school-wide and regional public interest in the following ways, among numerous others to be shown at trial. His actions and the responses of the administration, including those of Defendant LaForge, follow:

2

a. In the spring of 1990 Hays was one of the principal organizers of a Faculty Senate at Delta State over opposition from the administration. He became deeply involved in Faculty Senate activities for the first 6 years of its existence . He was the principal author of the Senate's original constitution and served once as Chair and twice as Vice-chair. During that time, the faculty successfully pushed for public access to the university budget. Also, a representative of the Faculty Senate, usually the  Chair , would have a seat and a vote on the Academic Council-the chief academic policy-making body of the University.  A representative of the senate would also sit on committees dealing with fiscal management of the University.

b. Also, in 1990 the administration took control of the student newspaper, the *Delta Statement,* apparently due to unflattering news stories, editorials, and cartoons. The administration appointed a puppet editor, who pushed out the entire student staff.  Dr. Hays helped those students form an alternative newspaper called *The Understatement.* He helped with fund-raising, edited copy and ghost-wrote some editorials.  He also contacted the *Jackson Clarion Ledger* , which then ran news and feature stories about "newspapergate".  The alternate newspaper was published for a year.

c. In the early 1990's, Dr. Hays helped students organize two separate protests on campus. He also spoke at each of them.  The administration was opposed to holding both of them and tried to stop one of them.  The first was to protest deep budget cuts during the Fordice administration; the second was  to protest a plan to merge Delta State with Mississippi Valley State University.

d. Also in the early 1990's, Dr. Hays did a documented study of administrative and faculty salaries at Delta State and compared those with the national mean for

3

institutions of similar size. He found that most Delta State administrative salaries were above the mean, but the faculty salaries were far below the mean. He distributed those studies widely across the campus.

e. In the fall of 2000, Dr. Hays wrote and distributed an op/ed piece, protesting a very large raise of then Delta State President David Potter. Potter received a two-step increase in salary of 37 percent that year while faculty and staff received about a one percent raise.

f. In the spring of 2007, the administration proposed to install video surveillance cameras in selected classrooms to protect against theft of expensive equipment. Many faculty believed the surveillance would have a chilling effect on academic freedom. Dr. Hays helped to organize opposition to the plan and eventually the plan was discarded.

g. In 2009, Provost Ann Lotven tried to deny a tenure- track contract to a faculty member even though the contract had been promised to her upon her obtaining her Ph.D. in communications. Dr. Hays organized an appeal for her and the decision was reversed.

h. In the spring of 2010 Dr. Hays joined in the formation of an organization called The Coalition to Save Delta State. The group was founded to push back against proposed deep budget cuts that would hurt faculty and staff but leave administrators unscathed. The group opened a Facebook site, printed brochures and distributed them widely on campus.

4

i. In March, 2010, Dr. Hays helped circulate letters/petitions that were presented to President John Hilpert, requesting that the process of determining budget reductions in academics be removed from the University Budget Committee (UBC) and given to each College or School, according to the proportion of the DSU budget accorded each College or School, and that each College or School be allowed to determine for and by itself how and/or where within its own budget to make these apportioned budget reductions. President Hilpert took no action. .

j. In June, 2010, the University Budget Committee (UBC) released its preliminary report, recommending deep budget cuts and elimination of academic programs in languages, literature, communications and theater with a window for the units to respond. The UBC released its final report in August. Dr. Hays published op/ed pieces (see, for example, Exhibit "1a": op/ed by Bill Hays in the September 19, 2010 issue of the *Cleveland Current*) and letters to the editor in local newspapers.

k. In February, 2011, Dr. Hays filed a grievance against Provost Ann Lotven, alleging that she had put a lot of his writings in a report of hers without attribution or documentation. He eventually withdrew the grievance, hoping that she and he could have a better working relationship.

l. In the fall of 2011, Dr. Hays granted an interview to the student newspaper. He was quoted in the student newspaper on September 8, 2011, as pointing out several flaws in the UBC report. The Human Resources Director, Myrtis Tabb, sent him a letter, chastising him for speaking to the student reporters and demanding that he verify to her in writing if the quotes in the article were, in fact, made by him. Upon advice of legal counsel, Dr. Hays did not reply. Nothing further came of it.

m.  During the academic year 2010-2011 Dr. Hays learned that a full-time administrator had been promoted to full professor, an academic promotion, in violation of University policy, which requires vetting at several levels by academic departmental committees, department chairs and academic deans prior to submission to the provost, and final decision by the president. (Exhibit "2", portions of the Delta State University Promotion Policies and Procedures for Teaching Faculty, lines187-209, attached and incorporated herein verbatim). Upon learning further that then President Hilpert had ignored a letter of protest by the University Tenure and Promotion Committee, which included a request that the promotion be revoked, Dr. Hays decided he would try to inform the public of the irregularity by referring to it in his 2011-2012 annual public report as Division Chair.  His purpose was to give citizens, academic and general, critical information on a matter of university and public concern, an administrative action which undermined the legitimacy of the position of full professor and risked subjecting DSU to accreditation and public perception problems. This was not an action which Hays would routinely perform in the course of writing his annual public report, but rather an attempt to inform the public on a matter having serious implications for the integrity of the institution. In a portion of Section V.e, of his annual report, entitled " Recommended Change(s) of Status",  under the subheading of "Narrative" 'Dr. Hays wrote:

> 4) Dr. Beverly Moon, who holds a full-time administrative position as Dean of Research, Assessment, and Planning, was promoted from Associate Professor of English to Professor of English without proper vetting.  The Unit's Tenure and Promotion Committee, the Chair of the Division and, perhaps, the Dean of Arts and Sciences were by-passed in the promotion process; thus the Unit did not and does not approve of this promotion nor do we understand how it was justified....

Exhibit "3", attached hereto and incorporated herein verbatim.

n.  In response Provost Ann Lotven emailed an admonishment to Hays on June 13, 2013, complaining that his entry included inappropriate "opinion" and, therefore, the entry was edited by her to exclude the above section of paragraph 4. ( Exhibit "4", attached hereto and incorporated herein verbatim.) The item referenced facts, not opinion, and Lotven's redaction without permission from Hays amounted to censorship.


o.  Dr. Hays complained to President LaForge by email about his annual report being censured. After a string of emails between them ( Exhibit "5", attached and incorporated herein verbatim) in which LaForge commented that , "It's time for the games to stop," and agreed with  Provost Lotven that "some of [Hays'} language is inappropriate and misplaced," Hays met with LaForge and Lotven on June 17, 2013, in the Presidential Conference Room.  At that meeting LaForge dismissed Hays' concern, saying his comments in his Report were "inappropriate" because they appeared in a document intended for public view.  Hays recalls that LaForge said:

> You should not have made these statements [which were
> redacted by Lotven] because they were said in a public
> document.  We need to put on our best face; we don't
> need people on the outside to know this.  We have
> our SACS review coming up, and the SACS evaluators
> shouldn't see these things.


p.  For the past 3 years, Hays, along with other faculty, has voiced strong opposition to various plans to slash the University's General Education Core Curriculum.  In one particular case, Hays challenged a proposed curriculum change, authored by Dr. David Hebert of the Math Department.  The proposal was to eliminate 9 hours of General Education courses (one in literature, one in history and one in social sciences).  Only one of those courses, literature, was in the Division chaired by Hays.

7

q. On October 8, 2013, Hays sent an email (with an attached draft of the proposed programs and courses to be cut) to many faculty members who would be affected, including those outside of his Division, asking them to be "proactive" in opposing the cuts to the General Education Core. (Exhibit "6", attached hereto and incorporated herein verbatim.) Hays was motivated by his strong belief that the cuts would 1) weaken the curriculum for all of the students; 2) harm recruiting for the University; and 3) produce graduates who would be less prepared to deal with the responsibilities of citizenship.

r. Hays' October 8, 2013 email urging faculty to be proactive in opposing the cuts provoked disciplinary action by the administration in the form of a formal "documented oral warning" containing an allegation that Hays had intentionally misled his colleagues. Also, his motivation was described as "questionable," Hays unsuccessfully appealed that disciplinary action through the University's grievance procedure. At a hearing before the Faculty Grievance Committee he presented in his defense a letter signed by all 9 tenured members of the Language and Literature Division, supporting him and challenging the assertions in the warning. (Exhibit "7" attached and incorporated herein verbatim.) President LaForge gave final approval to the imposition of the disciplinary action on June 5, 2014 (Exhibit "8", attached and incorporated herein verbatim.) The "documented oral warning" was approved by Defendant in retaliation for Hays speaking as a citizen on matters of public concern.

s. During academic year 2013-14, Dr. Hays was especially outspoken about cuts to the General Education Core. He joined about 100 other faculty in co-signing a letter drafted by Susan Allen Ford, a faculty member, in which she presented a passionate defense of the General Education Core and opposition to the proposed reduction and elimination of key courses. Initially, she sent the letter to the

8

General Education Committee on February 19, 2014 with 20 co-signatures from the Division of Languages and Literature. Later, the letter was re-circulated and was co-signed by100 faculty members, including 10 department chairs from many academic units of the University.(Collective Exhibit "9"—10 pages). Included were some departments which were not directly affected. The letters/petitions were presented to the General Education Committee in early May.

t. Since leaving the office of Division Chair, Dr. Hays has learned from the current Interim Chair, Don Allen Mitchell, that he had been instructed to change the language of Hays' last annual report (for 2013-14) because "it wasn't clean enough" for a public document. That report has not yet been published publicly.

u. As of this writing, the University has announced final plans for substantial cuts in the General Education Core Curriculum, and in addition complete elimination of majors in journalism and theater and communication studies, among others. This action has been covered by several news media, not only locally, but also in Mississippi's only state-wide newspaper, *The Jackson Clarion-Ledger*, and on television, with commentators reporting and debating the merits of the program cuts and/or the reactions of those who will be affected. This story and spin-off stories of reactions by affected students, faculty, alumni and others, have also been picked up by other news outlets.

v. On November 26, 2014, the publisher of the *Clarksdale Press Register,* Nathan Duff, wrote an editorial, entitled, "Cuts at DSU will be detriment to Delta". ( See, Exhibit 10, attached and incorporated herein verbatim.) Mr. Duff stressed how important DSU is for the entire Mississippi Delta and expressed great concern about the looming academic cuts. He noted,

> ....Several faculty and staff jobs will be lost, and
> members of the faculty have indicated to me that
> they are afraid to speak out for fear that their program
> will be next.
> Unafraid to speak out has been former Chair of the

> Division of Languages and Literature, Professor Bill Hays.
> Hays has long been a gadfly insistent on the academic integrity
> of DSU, and he was summarily demoted from his chairmanship
> earlier this year in a move that many categorized as LaForge's
> clearing of the decks before the budget cuts hit. Hays is suing
> LaForge in federal court for wrongful termination.

Whether one agrees or disagrees with the opinions expressed by Mr. Duff, his
editorial does exemplify the broad public concern over the academic cuts at DSU,
and also underscores the role of Bill Hays as an unafraid leader of opposition to
those changes, not just to protect his turf, but to sound the alarm for the entire
region.

w. Many alumni and others wrote to President LaForge, protesting the
cancellation of Dr. Hays' administrative contract and expressing concern for the
future of Delta State University because of the academic cuts. A local citizen,
with no direct connection with the University, was outraged. She emailed the
President a stinging rebuke:

> I've heard about the removal of Bill Hays from the chair of the
> Language Dept. and am completely dumbfounded and outraged.
> Just being a member of the community with no direct
> connection to DSU, I don't really know any of the particulars. I'm
> speaking from the point of view of the negative perception this
> makes in the community.
>
> &ast; &ast; &ast;
>
> As I said, I have no dog in this fight other than knowing that
> Bill Hays does not deserve this treatment. I assume a massive
> shudder went through the entire faculty (except maybe from
> those with an inside track to you and this cabinet) when the
> word got out.

Several others also sent emails to LaForge, expressing shock at the ouster
of Hays. LaForge responded to each, suggesting that undisclosed facts justified
his decision. Collective Exhibit 14.

x. When Hays has spoken out in opposition to the program cuts, he was not simply complaining about routine issues in the purview of his duties as Chair of his Division. He was speaking out as a citizen on an issue of great importance and concern to the entire University and its alumni, as well as the local community and the Mississippi Delta region at large. His Chairmanship of his Division was taken from him in retaliation for his speech on matters of widespread public concern and to silence that speech, or at least to reduce the effectiveness of that speech. His speech has always been intended for the present and future good of Delta State University, its students and faculty, and all who are affected in one way or another by the existence of the University. The University has no reasonable administrative need to stifle that speech or to retaliate for it.

12. On August 15, 2014 President LaForge, accompanied by Dean of Arts and Sciences David Breaux and current Provost Charles McAdams, unexpectedly arrived in a departmental meeting of the Division of Languages and Literature.

13. For at least 15 minutes President LaForge launched a tirade of criticism and threats, directed at Plaintiff Hays, in a deliberate attempt to humiliate him before his peers and intimidate him and them. (Exhibit 11, CD of Defendant's impromptu speech.)

14. Specifically, addressing Plaintiff Hays directly, Defendant launched into the following rant:

....I'm here to tell you because of all the stuff that"s gone on over the past few months that we're not going to put up with it anymore. Now, some of you will leave, some of you will be retiring, so you have nothing to lose, but I'm afraid you're going to have to bear the brunt of it. Because, I'm telling you to stand down, Bill Hays, I'm telling you to stand down. That's my expectation for you, and your colleagues are going to be held accountable. The attitudes, the bad behaviors, the passive-aggressiveness, are related to your contract non-renewal that affected this division until it's toxic, it's untenable, it's unprofessional, uh, you know you've raised this, Bill, to a level of a Shakespearean tragedy which is so appropriate (someone chimes in "Yes, it is"!)

11

and that's in your mind. That's not the way it is. It's not there. That's a
folly. And you all have to realize that. And I'm afraid that some of you
are being pulled into that and it's going to be damaging. Not only to
this division but also to individual careers if you keep this up, Bill.
you're not Chair anymore. You can't act like chair anymore. You're
not an advisor....Chip is in charge now. Chip is all y'all's boss. And so
are we. The time has come for everybody to understand that.

15. Defendant LaForge followed up with unfounded accusations against Professor Hays:

....I'm going to tell you what the real facts are....Yelling at an interim
Chair. Slipping cartoons under the door. Stimulating alumni.
Shame on you to write Facebook pages....Whether you did it or not,
somebody enabled that. Somebody gave them the information. From
this division. Whether it was you, Bill, or whether it was somebody
else. I'm not accusing you. At this point, I really don't care what
happened. This is all about going forward. It's not going to be
tolerated. One of the most abominable things, I think, is that you've
involved students. That's shameful. It's probably academic
malfeasance. I don't know what it is ....and alumni,too. Stirring up
alumni. What a silly campaign. Getting alumni to write to me.
Whether you say or anybody says they did it on their own accord, it
makes no difference. Every one of my responses was not written to
them. They were all written right back to you. So, it's a game, Bill.
There are a lot of games here.

16. Defendant LaForge then turned his attention to the assembled faculty-18 members besides
Professor Hays:

....And I know that most of you don't have anything to do with it, but
some of you do. You have choices to make....The unprofessional

12

activity, Bad form. Going into the issue of dealing with our alumni, dealing with students, poisoning their minds, to champion a personnel issue. Unprofessional, unprofessional, you know, a distortion of facts. It's crazy. Now, I understand the core of this, Bill, you don't like it. Some of you don't like it, senior colleagues, that there was a change made. The change was long overdue, first of all. I'll tell you that...and you've got to get over it....If you're not happy, go do something else.... (interruption) Resign, retire. I'm not trying to drive anybody off. We are assessing standards and setting parameters. And I really want you all to think about that,...

Defendant LaForge refocused on Professor Hays:

Bill, you spoke to your interim chair the other day about respect. You know, your career is supposed to be distinguished, but it's not going to be if you continue on in this track. It's going to be sad when you leave here. If you continue doing what you're doing and what you do to support that. Let me clarify a few things here. I want to give it to you straight. I want you to listen to me. Chip is the interim Chair at our request. Our request. He didn't seek this. He didn't come to us. He had nothing to do with it....He came to us because we asked him to and he was drafted basically....So, if you want to pick on somebody, pick on me....Enough is enough. Things are happening in the hallways. Silly, childish, immature. Unbelievable.

17.    President LaForge then gratuitously laid bare before the assembly a personnel issue (credentialing) involving three other faculty in attendance. He held Professor Hays responsible for the undescribed problems.

"The credentialing issue is squarely on your shoulders."

13

18. President LaForge then turned on one of the three faculty and accused him of insubordination.

19. Turning again toward Professor Hays, LaForge released another volley.

> This is a situation that has been created all about Bill.
> This is Delta State University, not Bill Hays University,
> and your colleagues need to hear that. You are being
> told, no. Stand down. Your position on things. Quit
> fighting a battle that's over and get back to the business
> of teaching students....

### IV.

### FEDERAL CLAIM
### FIRST AMENDMENT, APPLICABLE TO THE STATE
### THROUGH THE FOURTEENTH AMENDMENT

20. Plaintiff Hays was demoted from his position as Chair because he championed the rights and welfare of students, faculty, and the public at large—i.e., because he spoke out and rallied against academic cuts, supported by Defendant LaForge.

21. Professor Hays spoke out as a citizen in the public forum on issues of great public concern, not just to those in his Division, and not just to those on campus, but to many throughout the Mississippi Delta and beyond.

22. Professor Hays' speech as a citizen on matters of public concern outweighed any interest which the institutional employer might have in restricting his speech.

23. Professor Hays also was pilloried for advocating for accountability and transparency by the Administration in fiscal matters and matters of faculty promotions.

24. Defendant LaForge, acting in his official capacity as President of Delta State University, set in motion the plan and the execution of the demotion of Professor Hays from his position as

14

Chair of the Division of Language and Literature in retaliation for Hays" exercise of his First Amendment right to speak out as a citizen on matters of public concern although the University had no countervailing legitimate interest in stifling his speech. The violation of Hays' First Amendment right of speech is ongoing because of continuing retaliation (refusal of Defendant to reinstate Plaintiff as Chair of the Division of Language and Literature and continuing demeaning public comment about Plaintiff by Defendant and continuing withdrawing of appropriate courses from Plaintiff's teaching schedule and because of continuing refusal to pay back pay.) Therefore Plaintiff is entitled to injunctive relief.

**V.**

**STATE LAW CLAIMS**
**SLANDER AND SLANDER PER SE**

25. Defendant LaForge, acting in his individual capacity, on August 15, 2014, made the following false and malicious statements to an assembly of faculty with full knowledge of their falsity, or with reckless disregard for their truth and with the deliberate, malicious and wrongful intent to ruin Plaintiff's professional and personal reputations among his peers and others in an effort to neutralize him on debate about serious academic cuts and student opportunity and faculty promotion issues on campus at DSU.

> ....Because, I'm telling you to stand down. Bill Hays, I'm
> telling you to stand down....The attitudes, the bad behaviors,
> the passive aggressiveness, are related to your
> contract non-renewal that affected this Division until it's
> toxic, it's untenable, it's unprofessional....The antics that you are
> doing are really disrespectful....I'm going to tell you what the
> real facts are. You know, the antics that are really embarrassing,
> yelling at an interim chair, slipping cartoons under the door. You know.
> Stimulating alumni. Shame on you to write Facebook pages. One of the
> abominable things, I think, is that you've involved students. That's

15

shameful. It's probably academic malfeasance. And alumni too. Stirring up alumni. What a silly campaign. Getting alumni to write to me. The unprofessional activity. Bad form. Going to the issue of dealing with our alumni, dealing with students, poisoning their minds, to champion a personnel issue. Unprofessional, unprofessional …a distortion of facts, it's crazy. The misery and the tormenting and all the other stuff is absolutely intolerable. Bill,…You know, your career is supposed to be distinguished, but it's not going to be if you continue on this track. It's going to be sad when you leave here. If you continue doing what you're doing and what you do to support that. Things are happening in the hallways. Silly, childish, immature. Unbelievable. If you perpetuate these things, Bill, and those who champion what you are doing, it's just going to lead to a bad path…. Your professional behavior, others who are supporting you, are killing this division….I know you like to announce to your colleagues that you are a trained litigator [referring to Hays].

26. The statements were made in the presence of the Division's faculty and were unprivileged as those individuals had no legitimate need to hear the statements, or if a privilege applied, then the Defendant exceeded the scope of the privilege.

.

27. The statements demonstrated malice.

28. Defendant knew his statements were false or showed reckless disregard for the truth. The slander was clear and unmistakable from the words actually spoken, and not the product of innuendo, speculation or conjecture.

## FALSE LIGHT INVASION OF PRIVACY

29. Defendant LaForge, in his individual capacity, intentionally portrayed Professor Hays in a false light. Specifically, Plaintiff submits the following utterances by Defendant on August 15, 2014, to the faculty of the Languages and Literature Division:

> Someone along the way has forgotten the students. I think
> What we're dealing with here is a Division where there are
> some antics going on that have become a sad distraction to
> to the University and it becomes an embarrassment to the
> University.
>
> This Division…there's a pattern in this division of belligerence,
> of rudeness, of really unprofessional behavior.
>
> I'm here to tell you of all the stuff that's gone on over the past
> few months that we are not going to put up with it anymore.
> Because, I'm telling you to stand down. Bill Hays, I'm telling you to
> stand down.
>
> The attitudes, the bad behaviors, the passive-aggressiveness, are
> related to your contract non-renewal that affected this division
> until it's toxic, it's untenable, it's unprofessional.
>
> I'm going to tell you some things. I'm going to tell you what the
> real facts are. You know, the antics that are really embarrassing.
> Yelling at an interim chair. Slipping cartoons under the door.
> You know.
>
> Stimulating alumni. Shame on you to write Facebook pages.
>
> From this division, whether it was you, Bill, or whether you
> did it or not, somebody enabled that. Somebody gave them

17

the information. Whether it was somebody else. I'm not accusing you.

One of the most abominable things, I think, is that you've involved students. That's shameful. It's probably academic malfeasance…. and alumni, too. Stirring up alumni. What a silly campaign. Getting alumni to write to me.

Whether you say or anybody says they did it on their own accord, it makes no difference. Every one of my responses was not written to them. They were all written right back to you. So, it's a game, Bill. There are a lot of games here.

The unprofessional activity. Bad form. Going to the issue of dealing with our alumni, dealing with students, poisoning their minds, to champion a personnel issue. Unprofessional, unprofessional, you know, a distortion of facts. It's crazy. Now, I understand the core of this, Bill. You don't like it.

The misery and the tormenting and all the other stuff is absolutely intolerable.

Bill, you spoke to your interim chair the other day about respect. You know, your career is supposed to be distinguished, but it's not going to be if you continue on in this track….If you continue doing what you're doing and what you do to support that.

Things are happening in the hallways. Silly, childish, immature. Unbelievable!

The matter of academic credentialing. Qualifications. Oh, my gosh

. Oh my gosh. Unbelievable. Chip had nothing to do with this. Chip inherited this problem from Bill.

This is a situation that has been created all about Bill. This is Delta State University, not Bill Hays University. And your colleagues need to hear that. You are being told, no. Stand down. Your position on things. Quit fighting a battle that's over and get back to the business of teaching students.

If you perpetuate these things, Bill and those who champion what you are doing, it's just going to lead to a bad path.

Your professional behavior, others who are supporting you, are killing this division....

30. The false light in which Professor Hays was placed would by highly offensive to a reasonable person; and

31. Defendant LaForge had knowledge of, or acted in reckless disregard of the falsity of the publicized matters and the false light in which Professor Hays would be placed before his peers and before the world.

32. The statements were unprivileged, but if a privilege applied, then the Defendant exceeded the privilege.


## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

33. Defendant LaForge, in his individual capacity, willfully and wantonly pilloried Professor Hays publicly before his professional peers for the wrongful purpose of shaming him and isolating him by encouraging his peers to shun him.

19

34. Subsequently, Defendant LaForge has used public speaking opportunities to blame and to ridicule Hays by name without basis whenever questions arise as to the appropriateness of cuts to DSU's academic programs. See, e.g., Exhibit 13, audio recording of derogatory comment about Hays before a faculty forum.

35. The interim Chair of the Division of Languages and Literature, Don Allen Mitchell, the hand-picked choice of Defendant LaForge, has continued to humiliate Professor Hays by assigning him a schedule containing only composition classes, as well as other actions to reduce his professional status which ordinarily would be taught by an adjunct instructor, or a junior member of the full-time faculty, not a full professor. On information and belief, Mitchell has acted on instructions of Defendant LaForge, or alternatively, to please him and with his knowledge. Exhibit 12.

.

36. The tirade against Professor Hays in front of his professional peers, the Defendant's continuing public ridicule of him and the malicious shrinking of Hays' professional stature by giving Hays' an adjunct's course load and removing him from several committees evoke outrage or revulsion in a civilized society.

37. As a proximate result of the foregoing intentional, malicious and outrageous conduct of Defendant LaForge and his lieutenant, Don Allen Mitchell, referenced in paragraphs 25-36 above, Plaintiff has suffered and is continuing to suffer extreme mental anguish, which in turn is negatively affecting his physical health, including, but not limited to depression, anxiety, insomnia and increased blood pressure.

## VI.

## REQUEST FOR RELIEF

38. Plaintiff William (Bill) Hays respectfully requests the following injunctive relief from the Defendant in his official capacity, on **Plaintiff's First Amendment Retaliation claim:**

> a. Back supplemental pay for Divisional Chair, reinstatement as Divisional Chair,

or in the alternative, two years front pay; and

    b. An award of court costs, including Plaintiff's reasonable attorney fees and expenses pursuant to 42 U.S.C. §1988.

39. Plaintiff seeks the following relief from Defendant LaForge in his individual capacity for Each of his state common law intentional tort claims of **Slander and Slander Per Se, False Light Invasion of privacy and Intentional Infliction of Emotional Distress:**

    a.   A jury trial;

    b. Reasonable compensatory damages;

    c. Reasonable punitive damages;

    d. Attorney fees and expenses pursuant to state law;

    e. Costs of court.

**RESPECTFULLY SUBMITTED,**

**WILLIAM  (BILL) HAYES**


**BY:  /s/ RONALD W. LEWIS**


**RONALD  W. LEWIS, MBN 1242**
**404 GALLERIA LANE**
**OXFORD, MS38655**
**PHONE: (662) 234-0766**

**ron@ronlewislaw.com**
