IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
GREENVILLE DIVISION

DR. WILLIAM BILL HAYS                                          PLAINTIFF

v.                                          CIVIL ACTION NO.: 4:14-cv-00148-GHD-JMV

WILLIAM N. LAFORGE, in his
official capacity as President of Delta
State University and in his individual
capacity                                                      DEFENDANT

## MEMORANDUM OPINION GRANTING DEFENDANT'S MOTION TO DISMISS

Presently before the Court is Defendant William N. LaForge's motion to dismiss [38]

filed pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. Upon due

consideration, the Court finds that the motion is well taken and should be granted, for the reasons

set forth below.

### A. Factual and Procedural Background

On October 20, 2014, Plaintiff Dr. William Bill Hays ("Plaintiff"), former Chair of the

Division of Languages and Literature at Delta State University, filed this action against

Defendant, William N. LaForge, in his official capacity as President of Delta State University

and in his individual capacity ("Defendant").[1] Plaintiff asserts a federal claim for First

Amendment free speech retaliation under 42 U.S.C. § 1983 against Defendant in his official

capacity and state law claims for slander, slander per se, false light invasion of privacy, and

intentional infliction of emotional distress against Defendant in his individual capacity. Plaintiff

alleges the following facts in support of his claims:

---

[1] Significantly, Defendant was employed as President of Delta State University on April 15, 2013.

1

Delta State University hired Plaintiff in August of 1981. Pl.'s 2d Am. Compl. [35] ¶ 4. For many years, Plaintiff served as Chair of the Division of Languages and Literature, a position which carried an enhancement to his teaching salary. *Id.* On May 22, 2014, Plaintiff was notified by letter from Paul Hankins, Interim Dean of the College of Arts and Sciences, that Plaintiff would not be reappointed to the administrative office of Chair of the Division; no explanation was given for the decision, which was made by Defendant. *Id.* ¶¶ 5–6. Plaintiff approached Hankins for an explanation but was repeatedly told, "It's not for cause. It's not for cause." *Id.* ¶ 7. Plaintiff now serves as a professor of English at Delta State University. *Id.* ¶ 2.

Plaintiff alleges that his removal from the division chair position occurred even though he "regularly received top ratings on annual evaluations," *id.* ¶ 8; over the years "demonstrated a deep commitment to advocacy for all faculty, not just those in his Division, as well as for all students, not just those within his Division," *id.* ¶ 9; and "routinely sought transparency of University financial matters, including access by the public at large to the University budget," *id.* Plaintiff maintains that his "efforts on behalf of all students and faculty, for academic freedom and fairness, as well as for public access to the budget and transparency of University administration decisions, frequently put him at odds with University administration." *Id.* ¶ 10. Plaintiff's second amended complaint sets out in detail several of his alleged activities on behalf of students and faculty, as well as the alleged opposition he received from university administration as a result of these activities. *See id.* ¶ 11(a)–(x). Plaintiff alleges that during a departmental meeting of the Division of Languages and Literature on August 15, 2014, Defendant, Dean of Arts and Sciences David Breaux, and Provost Charles McAdams "unexpectedly arrived" and that "[f]or at least 15 minutes [Defendant] launched a tirade of criticism and threats, directed at [Plaintiff], in a deliberate attempt to humiliate him before his

peers and intimidate him and them"; Plaintiff's second amended complaint recounts Defendant's alleged statements at that meeting. *See id.* ¶¶ 12–19.

On April 10, 2015, Defendant filed the present motion to dismiss [38] pursuant to Rules 12(b)(1) and 12(b)(6). Plaintiff has filed a response, and Defendant has filed a reply. The matter is now ripe for review.

### B. Analysis and Discussion

In his motion to dismiss, Defendant contends that Plaintiff's 42 U.S.C. § 1983 First Amendment free speech retaliation claim must be dismissed for the following reasons. First, Plaintiff contends pursuant to Rule 12(b)(1) that Defendant is subject to Eleventh Amendment immunity on the claim. Second, Defendant contends pursuant to Rule 12(b)(6) that Plaintiff has failed to state a claim for First Amendment free speech retaliation. In addition, Defendant contends that in the event the Court dismisses the federal claim the Court should decline to exercise supplemental jurisdiction over the remaining state law claims.

"When a Rule 12(b)(1) motion is filed in conjunction with a Rule 12(b)(6) motion, . . . courts must consider the jurisdictional challenge first." *McCasland v. City of Castroville, Tex.*, 478 F. App'x 860, 860 (5th Cir. 2012) (per curiam) (citing *Wolcott v. Sebelius*, 635 F.3d 757, 762 (5th Cir. 2011); *Moran v. Kingdom of Saudi Arabia*, 27 F.3d 169, 172 (5th Cir. 1994)). This " 'prevents a court without jurisdiction from prematurely dismissing a case with prejudice.' " *Id.* at 860–61 (quoting *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001) (per curiam)); *accord Hitt v. City of Pasadena, Tex.*, 561 F.2d 606, 608 (5th Cir. 1977) (per curiam). Accordingly, the Court will first address Defendant's arguments for dismissal under Rule 12(b)(1) and will then address Defendant's arguments for dismissal under Rule 12(b)(6).

## Rule 12(b)(1)

A Rule 12(b)(1) motion allows a party to challenge the Court's subject matter jurisdiction. " '[A] factual attack under Rule 12(b)(1) may occur at any stage of the proceedings, and plaintiff bears the burden of proof that jurisdiction does in fact exist.' " *Arena v. Graybar Elec. Co.*, 669 F.3d 214, 223 (5th Cir. 2012) (quoting *Menchaca v. Chrysler Credit. Corp.*, 613 F.2d 507, 511 (5th Cir. 1980) (citations omitted)).

The Fifth Circuit has instructed:

> A case is properly dismissed for lack of subject matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate the case. In considering a challenge to subject matter jurisdiction, the district court is free to weigh the evidence and resolve factual disputes in order to satisfy itself that it has the power to hear the case. Thus, under Rule 12(b)(1), the district court can resolve disputed issues of fact to the extent necessary to determine jurisdiction[.]

*Smith v. Reg'l Transit Auth.*, 756 F.3d 340, 347 (5th Cir. 2014) (quotation marks and citation omitted).

In ruling on a Rule 12(b)(1) motion to dismiss, the Court may rely on (1) the complaint alone, presuming the allegations to be true; (2) the complaint supplemented by undisputed facts; or (3) the complaint supplemented by undisputed facts and by the Court's resolution of disputed facts. *See Freeman v. United States*, 556 F.3d 326, 334 (5th Cir. 2009) (citing *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981)). "Dismissal with prejudice for failure to state a claim is a decision on the merits and essentially ends the plaintiff's lawsuit, whereas a dismissal on jurisdictional grounds alone is not on the merits and permits the plaintiff to pursue his claim in the same or in another forum." *Hitt*, 561 F.2d at 608.

In the case *sub judice*, Defendant contends pursuant to Rule 12(b)(1) that he is entitled to sovereign immunity on the First Amendment free speech retaliation claim. "The Eleventh

Amendment strips courts of jurisdiction over claims against a state that has not consented to suit." *Pierce v. Hearn Indep. Sch. Dist.*, 600 F. App'x 194, 197 (5th Cir. 2015) (per curiam) (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100–01, 104 S. Ct. 900, 79 L. Ed. 2d 67 (1984)).

Sovereign immunity is a broad jurisdictional doctrine prohibiting suit against the government absent the government's consent. Sovereign immunity was assumed at common law, brought from England to the colonies, and existed prior to the ratification of the United States Constitution. Although the term "sovereign immunity" nowhere appears in the Constitution, the concept was perhaps woven into the very fabric of the document. Andrew Hamilton explained:

> It is inherent in the nature of sovereignty not to be amenable to the suit of an individual without its consent. This is the general sense, and the general practice of mankind; and the exemption, as one of the attributes of sovereignty, is now enjoyed by the government of every State in the Union.

The Federalist No. 81, at 511 (Alexander Hamilton) (Wright ed., 1961). At the Virginia ratifying convention, James Madison stated: "Jurisdiction in controversies between a state and citizens of another state is much objected to, and perhaps without reason. It is not in the power of any individuals to call any state into court." 3 Debates on the Federal Constitution 533 (J. Elliot 2d ed., 1854). At that same convention, John Marshall stated: "With respect to disputes between a state and the citizens of another state, its jurisdiction has been decried with unusual vehemence. I hope no gentleman will think that a state will be called at the bar of the federal court." 3 *id.*, at 555.

Despite the long-standing principle of sovereign immunity, in 1793, the United States Supreme Court held that a state could be sued by a citizen of another state or a foreign country.

*See Chisolm v. Georgia*, 2 Dall. 419, 1 L. Ed. 440 (1793). But five years later, the states ratified the Eleventh Amendment, which provides: "The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI; *see* C. Jacobs, The Eleventh Amendment and Sovereign Immunity 64–75 (1972). The Fifth Circuit has stated: "Eleventh Amendment immunity operates like a jurisdictional bar, depriving federal courts of the power to adjudicate suits against a state." *Union Pac. R. Co. v. La. Pub. Serv. Comm'n*, 662 F.3d 336, 340 (5th Cir. 2011) (internal citations omitted). "The Eleventh Amendment grants a State immunity from suit in federal court by citizens of other States, and by its own citizens as well." *Lapides v. Bd. of Regents*, 535 U.S. 613, 616, 122 S. Ct. 1640, 152 L. Ed. 2d 806 (2002) (citation omitted). Indeed, "[t]he amendment has been judicially construed to bar federal jurisdiction over suits brought against a state by its own citizens, despite the absence of language to that effect." *See Jagnandan v. Giles*, 538 F.2d 1166, 1177 (5th Cir.), *cert. denied*, 432 U.S. 910, 97 S. Ct. 2959, 53 L. Ed. 2d 1083 (1977) (citations omitted). Both federal and state law claims are barred from being asserted against a state in federal court. *Pennhurst State Sch. & Hosp.*, 465 U.S. at 119–21, 104 S. Ct. 900.[2]

State immunity "extends to any state agency or entity deemed an 'alter ego' or 'arm' of the state." *Perez v. Region 20 Educ. Serv. Ctr.*, 307 F.3d 318, 326 (5th Cir. 2002). "This immunity also extends to state officials who are sued in their official capacities because such a suit is actually one against the state itself." *New Orleans Towing Ass'n, Inc. v. Foster*, 248 F.3d 1143, 2001 WL 185033, at *3 (5th Cir. Feb. 6, 2001); *see Hafer v. Melo*, 502 U.S. 21, 25, 112 S.

---

[2] Congress did not abrogate Eleventh Amendment immunity by granting federal courts supplemental jurisdiction over state law claims in 28 U.S.C. § 1367(a). *See Raygor v. Regents of Univ. of Minn.*, 534 U.S. 533, 541–42, 122 S. Ct. 999, 152 L. Ed. 2d 27 (2002).

Ct. 358, 116 L. Ed. 2d 301 (1991) (citing *Kentucky v. Graham*, 473 U.S. 159, 166, 105 S. Ct. 3099, 87 L. Ed. 2d 114 (1985)); *Pennhurst*, 465 U.S. at 117, 104 S. Ct. 900.

As its name implies, Delta State University is a state university in Mississippi and is managed and controlled by the Board of Trustees of State Institutions of Higher Learning. *See* Miss. Const. art. VIII, § 213A; Miss. Code Ann. § 25-65-5(a); *United States v. Fordice*, 505 U.S. 717, 721, 112 S. Ct. 2727, 120 L. Ed. 2d 575 (1992); *Ayers v. Thompson*, 358 F.3d 356, 360 n.3 (5th Cir. 2004). Therefore, Delta State University is an arm of the State of Mississippi unless an exception applies. *See Jagnandan*, 538 F.2d at 1175. There are three possible exceptions to Eleventh Amendment immunity: (i) valid abrogation by Congress; (ii) waiver or consent to suit by the state; or (iii) the state's amenability to suit under the *Ex parte Young* doctrine.

### (i) Abrogation

Abrogation, which is the first exception to Eleventh Amendment immunity, applies only if Congress has unequivocally expressed its intent to abrogate a state's sovereign immunity and is acting pursuant to a valid exercise of power. *See Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 55, 116 S. Ct. 1114, 134 L. Ed. 2d 252 (1996). Section 1983 does not explicitly indicate Congress's intent to abrogate a state's Eleventh Amendment immunity from suit. *See Quern v. Jordan*, 440 U.S. 332, 99 S. Ct. 1139, 59 L. Ed. 2d 358 (1979); *Edelman v. Jordan*, 415 U.S. 651, 94 S. Ct. 1347, 39 L. Ed. 2d 662 (1974). Accordingly, abrogation does not apply as an exception to Eleventh Amendment immunity in the case *sub judice*.

### (ii) Waiver/Consent to Suit

The second exception provides that Eleventh Amendment sovereign immunity from suit is waiveable, but such waiver must be clearly stated and will not be easily implied. *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 267, 117 S. Ct. 2028, 138 L. Ed. 2d 438 (1997);

*Jagnandan*, 538 F.2d at 1117 (citing *Edelman*, 415 U.S. at 673, 94 S. Ct. 1347; *Petty v. Tenn.-Mo. Bridge Comm'n*, 359 U.S. 275, 276, 79 S. Ct. 785, 3 L. Ed. 2d 804 (1959)).

Plaintiff makes no argument that Defendant has waived or consented to be sued. States (including arms of the state and state officers in their official capacities) are immune from suit on Section 1983 claims under the Eleventh Amendment, as states are not "persons" subject to liability under Section 1983. *Arizonans for Official English*, 520 U.S. at 69 & 69 n.24, 117 S. Ct. 1055; *see Will v. Mich. Dep't of State Police*, 491 U.S. 58, 66, 109 S. Ct. 2304, 105 L. Ed. 2d 45 (1989). Accordingly, waiver does not apply as an exception to Eleventh Amendment immunity in this case.

### *(iii) Ex parte Young Doctrine*

The third and final exception to Eleventh Amendment immunity is a state's amenability to suit under the *Ex parte Young* doctrine. To overcome Eleventh Amendment immunity, the plaintiff must bring an action grounded in federal law for monetary relief that is "ancillary" to injunctive relief against named state officials. *Edelman*, 415 U.S. at 667–68, 94 S. Ct. 1347.

Plaintiff's second amended complaint requests "injunctive relief" from Defendant on the official-capacity claim to include "[b]ack supplemental pay . . ., reinstatement as Divisional Chair, or in the alternative, two years front pay; and [a]n award of court costs, including Plaintiff's reasonable attorney['s] fees and expenses pursuant to 42 U.S.C. § 1988." Pl.'s 2d Am. Compl. [35] ¶¶ 24, 38. However, in Plaintiff's response to the motion to dismiss, Plaintiff states that he "admits he cannot recover money damages from the Defendant in his official capacity. Affirmatively, Plaintiff would show he has not demanded damages on his federal claim." Pl.'s Resp. Opp'n to Def.'s Mot. Dismiss [40] ¶ 2. Plaintiff has also filed a notice of withdrawal of his demand for back pay [45] on the official-capacity claim. Thus, the Court

construes Plaintiff's prayer for relief on the official-capacity claim as solely for injunctive relief in the form of reinstatement and for costs.

Plaintiff's Section 1983 claim for injunctive relief in the form of reinstatement as Divisional Chair is permitted only if brought against the appropriate state official and seeking prospective relief to end a continuing violation of federal law. *See Walker v. Livingston*, 381 F. App'x 477, 478 (5th Cir. 2010) (citing *Seminole Tribe*, 517 U.S. at 73, 116 S. Ct. 1114 (citing *Ex parte Young*, 209 U.S. 123, 28 S. Ct. 441, 52 L. Ed. 714 (1908))). "In determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.' " *Coeur d'Alene Tribe of Idaho*, 521 U.S. at 296, 117 S. Ct. 2028 (O'Connor, J., concurring in part and concurring in judgment).

"Section 1983 imposes liability on anyone who, under color of state law, deprives a person 'of any rights, privileges, or immunities secured by the Constitution and laws.' [T]his provision safeguards certain rights conferred by federal statutes." *Blessing v. Freestone*, 520 U.S. 329, 340, 117 S. Ct. 1353, 137 L. Ed. 2d 569 (1997) (citing *Maine v. Thiboutot*, 448 U.S. 1, 100 S. Ct. 2502, 65 L. Ed. 2d 555 (1980)). Plaintiff alleges that Defendant, acting under color of state law, violated federal law by removing Plaintiff from the division chair position and reassigning him to professor of English in retaliation for exercising his First Amendment right to free speech. Because Plaintiff has asserted that his removal from the division chair position at Delta State University was unlawful and seeks injunctive relief for the same from Defendant, Plaintiff has alleged prospective relief for an ongoing violation of federal law against Defendant. *See Nelson v. Univ. of Tex. at Dall.*, 535 F.3d 318, 324 (5th Cir. 2008) (former state university employee's request for reinstatement of employment in his suit for FMLA and constitutional

9

violations was "a claim for prospective relief designed to end a continuing violation of federal law" and was thus within the *Ex parte Young* exception to Eleventh Amendment immunity). Therefore, *Ex parte Young* allows Plaintiff's Section 1983 claim for prospective injunctive relief in the form of reinstatement as division chair against Defendant in his official capacity.

As to Plaintiff's claim for court costs, including attorney's fees and expenses pursuant to 42 U.S.C. § 1988, *Ex parte Young* does not foreclose such an award ancillary to a grant of prospective relief. *See Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 440, 124 S. Ct. 899, 157 L. Ed. 2d 855 (2004) (citing *Hutto v. Finney*, 437 U.S. 678, 685, 695, 98 S. Ct. 2565, 57 L. Ed. 2d 522 (1978) (award of attorney's fees/costs from state treasury were ancillary to prospective relief, as they were "incurred in litigation seeking only prospective relief" and allowed as penalty to enforce prospective injunction)); *Warnock v. Pecos County, Tex.*, 88 F.3d 341, 343 (5th Cir. 1996) ("Claims for fees associated with prospective relief and fees that may be awarded as costs are not barred by the Eleventh Amendment."). Therefore, Plaintiff's requests for court costs, including attorney's fees and expenses pursuant to 42 U.S.C. § 1988, are not foreclosed under *Ex parte Young*.

The Court now examines Defendant's argument for dismissal of the First Amendment free speech retaliation claim for failure to state a claim under Rule 12(b)(6).

### Rule 12(b)(6)

Defendant next contends that Plaintiff's case must be dismissed because he fails to state a claim under Rule 12(b)(6). Motions to dismiss pursuant to Rule 12(b)(6) "are viewed with disfavor and are rarely granted." *Kocurek v. Cuna Mut. Ins. Soc'y*, 459 F. App'x 371, 373 (5th Cir. 2012) (citing *Gregson v. Zurich Am. Ins. Co.*, 322 F.3d 883, 885 (5th Cir. 2003)). When deciding a Rule 12(b)(6) motion to dismiss, the Court is limited to the allegations set forth in the

complaint and any documents attached to the complaint. *Walker v. Webco Indus., Inc.*, 562 F. App'x 215, 216–17 (5th Cir. 2014) (per curiam) (citing *Kennedy v. Chase Manhattan Bank USA, NA*, 369 F.3d 833, 839 (5th Cir. 2004)).

"[A plaintiff's] complaint therefore 'must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." ' " *Phillips v. City of Dallas, Tex.*, 781 F.3d 772, 775–76 (5th Cir. 2015) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007))). A claim is facially plausible when the pleaded factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678, 129 S. Ct. 1937 (citing *Twombly*, 550 U.S. at 556, 127 S. Ct. 1955). "[P]laintiffs must allege facts that support the elements of the cause of action in order to make out a valid claim." *Webb v. Morella*, 522 F. App'x 238, 241 (5th Cir. 2013) (per curiam) (quoting *City of Clinton, Ark. v. Pilgrim's Pride Corp.*, 632 F.3d 148, 152–53 (5th Cir. 2010) (quotation marks omitted)). "[C]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." *Id.* (quoting *Fernandez–Montes v. Allied Pilots Ass'n*, 987 F.2d 278, 284 (5th Cir.1993) (internal quotation marks omitted)). "Dismissal is appropriate when the plaintiff has not alleged 'enough facts to state a claim to relief that is plausible on its face' and has failed to 'raise a right to relief above the speculative level.' " *Emesowum v. Hous. Police Dep't*, 561 F. App'x 372, 372 (5th Cir. 2014) (per curiam) (quoting *Twombly*, 550 U.S. at 555, 570, 127 S. Ct. 1955).

In this case, Plaintiff alleges that his removal from the division chair position and reassignment to professor of English were in retaliation for his repeated exercises of his First Amendment right to free speech, which is applicable to states through the Fourteenth

Amendment and urged through the vehicle of Section 1983. Section 1983 provides in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983. "To state a claim under [Section] 1983, a plaintiff must [1] allege the violation of a right secured by the Constitution and laws of the United States, and [2] must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48, 108 S. Ct. 2250, 101 L. Ed. 2d 40 (1988) (citing cases).

In order to sufficiently plead a First Amendment free speech retaliation claim, Plaintiff "must have alleged facts that show: (1) [he] 'suffered an adverse employment decision; (2) [his] speech involved a matter of public concern; (3) [his] interest in commenting on matters of public concern . . . outweigh[s] the [Defendant's] interest in promoting efficiency; and (4) [his] speech motivated the adverse employment decision.' " *Caleb v. Grier*, 598 F. App'x 227, 233 (5th Cir. 2015) (per curiam) (quoting *Beattie v. Madison Cnty. Sch. Dist.*, 254 F.3d 595, 601 (5th Cir. 2001)).

It is undisputed that Plaintiff has satisfied the first prong of his claim because the non-renewal of his contract as division chair and reassignment to the position of professor of English constitute an adverse employment action. *See Breaux v. City of Garland, Tex.*, 205 F.3d 150, 157 (5th Cir. 2000) ("Adverse employment actions are discharges, demotions, refusals to hire,

refusals to promote, and reprimands.").[3] However, Defendant maintains that Plaintiff has failed to satisfy the second and fourth prongs of his claim and argues the following in support: (1) Plaintiff's allegations do not constitute speech involving a matter of public concern; (2) the alleged speech was made pursuant to Plaintiff's official duties; (3) Plaintiff has failed to present facts showing a plausible causal link between his conduct and Defendant's action, that is, that Plaintiff's speech regarding "academic cuts" motivated Defendant's decision not to reappoint Plaintiff as division chair; and (4) the alleged speech concerning Plaintiff's attempted language in his annual report as division chair was government speech not subject to First Amendment protection. The Court will address these challenges in the context of Plaintiff's allegations.[4]

Plaintiff's ability to press his claim depends on whether the speech that prompted his removal and reassignment was constitutionally protected. *See Garcetti v. Ceballos*, 547 U.S. 410, 418, 126 S. Ct. 1951, 164 L. Ed. 2d 689 (2006). The first inquiry before the Court asks whether Plaintiff has sufficiently alleged he spoke as a citizen on a matter of public concern. The second inquiry before the Court asks whether Plaintiff has sufficiently alleged that his speech motivated his removal and reassignment. Although these two inquiries are worded

---

[3] Apparently, Plaintiff attempts to add an additional "adverse employment decision" in his response to the motion to dismiss: "a down-graded course load (composition courses), which ordinarily would be taught by an adjunct instructor or junior full-time faculty member, not a full professor." *See* Pl.'s Resp. Opp'n to Def.'s Mot. Dismiss [41] at 2. Defendant argues in his reply that this does not constitute an adverse employment decision in the Fifth Circuit. The Court finds that Plaintiff's attempt to add this additional adverse employment decision is misguided, as the same is not pled in his second amended complaint. However, even if the adverse employment decision were properly pleaded, as Defendant argues, it is not an adverse employment decision according to the Fifth Circuit standard explained above. For these reasons, the Court does not consider this untimely allegation in its analysis of Plaintiff's First Amendment free speech retaliation claim.

[4] The Court notes that Defendant does not challenge the third prong of Plaintiff's federal claim in the motion to dismiss. " 'The third element [of a free speech retaliation claim], being the factually-sensitive balancing test that it is, implicates only the summary judgment, not failure to state a claim, analysis.' Therefore, such a balancing inquiry is not warranted at th[e Rule 12(b)(6)] stage of the proceedings . . . ." *See Cox v. Kaelin*, 577 F. App'x 306, 312 (5th Cir. 2014) (quoting *Kennedy v. Tangipahoa Parish Library*, 224 F.3d 359, 366 n.9 (5th Cir. 2000) (abrogated on other grounds by *Twombly*, 550 U.S. at 563, 127 S. Ct. 1955)).

simply, to reach answers, the Court must engage in a complex analysis with myriad considerations.

### a. Whether Speech Was on Matter of Public Concern

It is well established that "the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Garcetti*, 547 U.S. at 417, 126 S. Ct. 1951 (citations omitted). "Speech by citizens on matters of public concern lies at the heart of the First Amendment, which 'was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people[.]' " *Lane v. Franks*, — U.S. —, 134 S. Ct. 2369, 2377, 189 L. Ed. 2d 312 (June 19, 2014) (quoting *Roth v. United States*, 354 U.S. 476, 484, 77 S. Ct. 1304, 1 L. Ed. 2d 1498 (1957)). The idea that "teachers may constitutionally be compelled to relinquish the First Amendment rights they would otherwise enjoy as citizens to comment on matters of public interest in connection with the operation of the public schools in which they work" is a "premise that has been unequivocally rejected in numerous . . . decisions of the [Supreme] Court." *Pickering v. Bd. of Educ. of Township High Sch., Dist. 205, Will Cnty.*, 391 U.S. 563, 568, 88 S. Ct. 1731, 20 L. E. 2d 811 (1968). "So long as employees are speaking as citizens about matters of public concern, they must face only those speech restrictions that are necessary for their employers to operate efficiently and effectively." *Garcetti*, 547 U.S. at 419, 126 S. Ct. 1951 (citing *Connick v. Myers*, 461 U.S. 138, 147, 103 S. Ct. 1684, 75 L. Ed. 2d 708 (1983)).

However, in *Garcetti*, the United States Supreme Court created the hard rule that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* at 421, 126 S. Ct. 1951; *Caleb*, 598 F. App'x at

14

233. The Fifth Circuit has consistently held that when a public employee engages in an activity required by his position or undertaken in the course of performing his job, his speech is within the purview of his "official duties." *See Williams v. Dall. Indep. Sch. Dist.*, 480 F.3d 689, 693 (5th Cir. 2007). "Formal job descriptions, although relevant, are not dispositive, as they 'often bear little resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate the conducting the task is within the scope of the employee's professional duties for First Amendment purposes.' " *Elizondo v. Parks*, 431 F. App'x 299, 303 (5th Cir. 2011) (per curiam) (quoting *Garcetti*, 547 U.S. at 424–25, 421, 126 S. Ct. 1951). Instead, "the inquiry is a 'practical one,' and the controlling factor is whether the plaintiff's expressions were made pursuant to one of the numerous duties for which the plaintiff was employed." *Id.* (quoting *Garcetti*, 547 U.S. at 421, 126 S. Ct. 1951). Thus, "[e]ven if the speech is of great social importance, it is not protected by the First Amendment so long as it was made pursuant to the worker's official duties." *Williams*, 480 F.3d at 692 (citing *Garcetti*, 547 U.S. at 421, 126 S. Ct. 1951).

" 'When a public employee speaks in his capacity as an employee and addresses personal matters such as personnel and employment disputes, rather than in his capacity as a citizen on a matter of public interest, his speech falls outside the protection of the First Amendment.' " *Marceaux v. Lafayette City-Parish Consol. Gov't*, --- F. App'x ---, 2015 WL 3544648, at *4 (5th Cir. June 8, 2015) (per curiam) (quoting *Salge v. Edna Indep. Sch. Dist.*, 411 F.3d 178, 186 (5th Cir. 2005)). However, "[t]he First Amendment . . . may still apply when the employees make statements relating to their public employment; the question 'is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties.' "

*Culbertson v. Lykos*, --- F.3d ---, 2015 WL 3875815, at *5 (5th Cir. June 22, 2015) (quoting *Lane*, 134 S. Ct. at 2379).

Although *Garcetti* obviously did not create a bright-line test for determining whether an employee acts in his official capacity or in his capacity as a citizen, the Fifth Circuit has highlighted several relevant factors mentioned in *Garcetti* to consider in the free speech analysis, including "whether the employee expressed views inside the office or publicly," "the subject matter of the relevant communication," and "most importantly, whether or not the statements were made pursuant to an official duty." *Benes v. Puckett*, --- F. App'x ---, 2015 WL 900438, at *3 (5th Cir. Mar. 4, 2015) (per curiam) (citing *Garcetti*, 547 U.S. at 420–21, 126 S. Ct. 1951). " 'Under *Garcetti*, we must shift our focus from the content of the speech to the role the speaker occupied when he said it.' " *Id.* (quoting *Davis v. McKinney*, 518 F.3d 304, 312 (5th Cir. 2008)).

In *Pickering*, the United States Supreme Court held that a teacher's First Amendment rights were violated when the school board dismissed him for sending a letter to a newspaper in connection with the school board's recently proposed tax increase that "constituted, basically, an attack on the [s]chool [b]oard's handling of 1961 bond issue proposals and its subsequent allocation of financial resources between the schools' educational and athletic programs. It also charged the superintendent of schools with attempting to prevent teachers in the district from opposing or criticizing the bond issue." 391 U.S. at 564–66, 88 S. Ct. 1731. The teacher's reporting of amounts the school district had expended on athletics "were matters of public record [and an issue of public concern] on which his position as a teacher in the district did not qualify him to speak with any greater authority than any other taxpayer," and thus that he was acting as a citizen. *Id.* at 572, 88 S. Ct. 1731. The Supreme Court observed: "Teachers are . . . the members of a community most likely to have informed and definite opinions as to how funds allotted to the

operation of the schools should be spent. Accordingly, it is essential that they be able to speak out freely on such questions without fear of retaliatory dismissal." *Id.*, 88 S. Ct. 1731. Thus, a teacher who writes a letter to a local newspaper addressing the funding policies of the school board can be acting as a citizen. *See Williams*, 480 F.3d at 693 (explaining *Pickering*, 391 U.S. at 563, 88 S. Ct. 1731). In other words, "[i]n *Pickering*, the Court . . . extend[ed] First Amendment protection to a teacher who was fired after writing a letter to the editor of a local newspaper criticizing the [school] board that employed him." *Lane*, 134 S. Ct. at 2374 (explaining *Pickering*, 391 U.S. at 568, 88 S. Ct. 1731).

Similarly, the United States Supreme Court has held that a teacher who complains to her principal about the school's discriminatory hiring practices can be acting as a citizen. *See Givhan v. W. Line Consol. Sch. Dist.*, 439 U.S. 410, 99 S. Ct. 693, 58 L. Ed. 2d 619 (1979). In *Givhan*, a case brought at the height of school desegregation litigation, a junior high English teacher was dismissed from her employment at the end of the school year for refusing to administer standardized tests to her students and other alleged acts of non-cooperation with the school, including "private encounters between [the plaintiff] and the school principal in which [the plaintiff] allegedly made 'petty and unreasonable demands' in a manner variously described by the principal as 'insulting,' 'hostile,' 'loud,' and 'arrogant.' " *Id.* at 411, 411 n.1, 99 S. Ct. 693. The United States Supreme Court held that the fact that the plaintiff's complaints and opinions concerning the school's allegedly racially discriminatory practices were made privately to her principal did not remove her comments from the purview of First Amendment protection, and the Supreme Court remanded the case for the factual determination of whether the plaintiff would have been terminated regardless of her "demands." *Id.* at 412–17, 99 S. Ct. 693. It is important to note that neither the private expression of the comments nor the contended nature of the comments—

variously described by the school principal as "insulting," "hostile," "loud," and "arrogant"—were sufficient to remove the comments from First Amendment protection. *See id.* at 412, 99 S. Ct. 693. Thus, a teacher who expresses vehement criticisms to her principal that certain school policies and procedures are racially impermissible can be acting as a citizen.

In *Lane v. Franks*, decided by the United States Supreme Court in 2014, Edward Lane, former director of Central Alabama Community College's program for underprivileged youth, fired an employee, Suzanne Schmitz, who was subsequently indicted by a federal grand jury for mail fraud and theft; her termination led to extensive press coverage; and Lane testified twice under subpoena at trial concerning events that led to his decision to terminate Schmitz. 134 S. Ct. at 2374–2375. Subsequently, the president of the college terminated Lane's employment, and Lane sued Franks in his individual and official capacities alleging First Amendment free speech retaliation in violation of Section 1983. *Id.* at 2376. The Supreme Court granted certiorari and held that "[t]he First Amendment . . . protects a public employee who provided truthful sworn testimony, compelled by subpoena, outside the course of his ordinary job responsibilities." 134 S. Ct. at 2374–2375. Notably, it was undisputed that Lane's ordinary job responsibilities did not include testifying in court proceedings. *Id.* at 2378 n.4. The Supreme Court held: "[T]he mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee—rather than citizen—speech. The critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Id.* at 2379. Thus, pertinent to the facts in this case, *Lane* makes clear that speech "that relates to public employment or concerns information learned in the course of public employment" can nonetheless be citizen speech protected by the First Amendment. *See id.* The Supreme Court further held that "[t]he content of Lane's testimony—

18

corruption in a public program and misuse of state funds—obviously involves a matter of significant public concern. And the form and context of the speech—sworn testimony in a judicial proceeding—fortify that conclusion." *Id.* at 2380 (citation and parenthetical omitted).

In the Fifth Circuit's recent *per curiam* decision *Marceaux v. Lafayette City-Parish Consolidated Government*, officers of the Lafayette Police Department alleged that the police chief and others retaliated against the officers after they voiced "various concerns or complaints . . . with their superiors" and "attempt[ed] to seek a temporary restraining order against the department to stop an internal investigation in an unrelated matter." 2015 WL 35446458, at *1, *3–*4. The Fifth Circuit held that the alleged speech "related to employment matters that were personal to the plaintiffs" and constituted "internal expressions of concern or complaint about the operation of the police department," including one plaintiff's meetings with the police chief, his administrative complaint, and his employment-discrimination complaint; these matters were "grievances communicated up the chain of command," which constituted employee speech on personal matters, not citizen speech on a matter of public interest subject to First Amendment protection. *Id.* at *4 (citing *Davis*, 518 F.3d at 313–15). "Further, the suit for a temporary restraining order also concerned only employment matters; the parties involved were seeking to block an internal investigation within the department." *Id.*

In *Charles v. Grief*, 522 F.3d 508 (5th Cir. 2008), the Fifth Circuit held that an employee of a state lottery commission who sent an e-mail to high-ranking commission officials raising concerns about racial discrimination and retaliation against him and other minority employees of the commission was acting as a citizen, but the Fifth Circuit explained that "most significantly" in that case, "[the plaintiff's] speech . . . was not made in the course of performing or fulfilling his job responsibilities, was not even indirectly related to his job, and was not made to higher-ups in his

19

organization . . . but was communicated directly to elected representatives of the people." 522 F.3d at 509–10, 514.

Other Fifth Circuit cases further illustrate these principles in practice. *See, e.g., Benes*, 2015 WL 900438, at \*4–\*5 (it was unclear whether plaintiff was speaking pursuant to job duties or as citizen when he wrote emails to city council discussing a project he was professionally involved as an engineer in which he acknowledged providing such project reports was his job responsibility when city council members were not his direct superiors but had some authority over his department); *Caleb*, 598 F. App'x at 236–37 (school employees' refusals to agree with purportedly false accusations made against a teacher in interviews ordered by school district officials and factually shown to be directly related to their employment was speech made pursuant to official duties and was thus not subject to First Amendment protection, as "it [was] undisputed that the speech at issue . . . was made within the chain of command and that it was related to the employees' jobs"); *Elizondo*, 431 F. App'x at 304 (state university employee who made statements to his supervisor about company's budget shortfall and how his job reassignment would impact his workload, salary, and reporting duties was acting in course of his official duties); *Davis*, 518 F.3d at 315 (audit manager who wrote letter to university president and her immediate supervisor discussing concerns about the university's inadequate response to her internal computer pornography investigation was acting in course of her official duties, but was not acting in the course of her official duties, and was thus a citizen, when she wrote the portion of her letter concerning the number of vice presidents and related issues, as "the topic does not relate to computer use or the internal audit department specifically" and "[t]here was no financial component to [the plaintiff's] position"); *Nixon v. City of Houston, Tex.*, 511 F.3d 494, 498–99

(5th Cir. 2007) (police officer who made comments at crime scene to media was acting in course of his official duties).

Turning now to the allegations of speech in the case *sub judice*, all of which are within the eleventh paragraph of Plaintiff's second amended complaint, the Court notes that the pleadings and attached documentation suggest at least two job duties of the division chair position: (1) playing a role in appointing faculty at the university, including review and recommendation of faculty candidates, *see* Delta State Univ. Promotion Policies & Procedures for Teaching Faculty [35-2] at 1–3; and (2) preparing an annual report describing the unit and its goals, Pl.'s 2d Am. Compl. [35] ¶ 11(m), Lotven Email to Pl. [35-4] at 1. With all of the foregoing in mind, the Court finds that the following allegations clearly fail to constitute citizen speech on matters of public importance.

First, Plaintiff alleges that in March of 2010 he helped to circulate letters/petitions to then-Delta State University President John Hilpert, requesting that the process of determining budget reductions in academics be given to each college or school to determine its own budget to make budget reductions which resulted in no action by the president. Pl.'s 2d Am. Compl. [35] ¶ 11(i). In this Court's opinion, this action was taken pursuant to Plaintiff's official duties. If the university president had decided to give each college or school within the university the power to determine its own budget as Plaintiff had urged him to do, the effect would have been a broadening of Plaintiff's job duties in his employment as a department chair. Therefore, Plaintiff's employment would have been directly affected. This is an example of speech "made within the chain of command" and "related to [Plaintiff's] job[ ], which are both factors that [the Fifth Circuit] has previously considered in determining that speech was made as an employee and not as a citizen." *See Caleb*, 598 F. App'x at 236–37; *Wetherbe v. Smith*, 593 F. App'x 323, 328 (5th Cir. 2014) (per curiam). *See also Davis*, 518 F.3d at 313 ("Cases from other circuits are consistent in

21

holding that when a public employee raises complaints or concerns up the chain of command at his workplace about his job duties, that speech is undertaken in the course of performing his job."). Furthermore, the allegations are of speech that occurred exclusively in the university, not publicly. *See Benes*, 2015 WL 900438, at \*4 (citing *Garcetti*, 547 U.S. at 420–21, 126 S. Ct. 1951). Accordingly, the Court is of the opinion that these allegations constitute employee speech that by definition is not subject to First Amendment protection. However, even assuming *arguendo* these allegations could be construed as citizen speech, Plaintiff has failed to sufficiently allege that the speech was a motivating factor in his removal and reassignment, as will be discussed later.

Second, Plaintiff alleges that in February of 2011 he filed a grievance against then-Provost Ann Lotven, alleging that she had put many of his writings in a report of hers without attribution or documentation, but then withdrew the grievance "hoping that she and he could have a better working relationship." Pl.'s 2d Am. Compl. [35] ¶ 11(k). In taking this alleged action, Plaintiff "expressed views inside the office," not publicly, and "the subject matter of the relevant communication" was criticism of the university provost for allegedly using Plaintiff's writings without giving him credit. *See Caleb*, 598 F. App'x at 236–37; *Davis*, 518 F.3d at 313. As with the plaintiffs in *Marceaux*, this alleged speech by Plaintiff "related to employment matters that were personal to the plaintiff[ ]" and internal to the university. *See Marceaux*, 2015 WL 35446458, at \*4 (citing *Davis*, 518 F.3d at 313–15); *Foley v. Univ. of Hous. Sys.*, 355 F.3d 333, 341 (5th Cir. 2003) ("Speech that is primarily motivated by, or primarily addresses, the employee's own employment status rather than a matter of public concern does not give rise to a cause of action under [Section] 1983."). The allegation that he subsequently withdrew the grievance "hoping that she and he could have a better working relationship" further highlights that this was an issue within the university itself pertaining to employment relations. Accordingly, this was not

22

actionable First Amendment speech. However, even assuming *arguendo* these allegations could be construed as citizen speech, Plaintiff has failed to sufficiently allege that the speech was a motivating factor in his removal and reassignment, as will be discussed later.

Third, Plaintiff alleges that in the fall of 2011 he pointed out perceived flaws in the University Budget Committee report in an interview to the student newspaper and did not respond to a subsequent letter from the university human resources director requesting confirmation that Plaintiff in fact made the statements to the student newspaper. Pl.'s 2d Am. Compl. [35] ¶ 11(l). The Court notes that Plaintiff's views were expressed to a newspaper published and distributed within Delta State University, and perhaps reaching as far as its alumni (but certainly not to the public at large), and that the reaction by the university human resources director further indicates this was an internal issue. Furthermore, the subject matter of the communication was the criticism of a university budget report—which was within the realm of Plaintiff's conceivable responsibilities and professional involvement as a university department chair. *See Benes*, 2015 WL 900438, at \*4 (citing *Garcetti*, 547 U.S. at 420–21, 126 S. Ct. 1951). In the opinion of this Court, these allegations constitute statements made pursuant to Plaintiff's official duties and are consequently not subject to First Amendment protection. However, even assuming *arguendo* these allegations could be construed as citizen speech, Plaintiff has failed to sufficiently allege that the speech was a motivating factor in his removal and reassignment, as will be discussed later.

Fourth, Plaintiff alleges that in his 2011–2012 annual report as division chair he attempted to refer to a perceived violation of Delta State University policy in his own department when a full-time administrator was promoted to full professor of English without required vetting at several levels. Pl.'s 2d Am. Compl. [35] ¶ 11(m). Plaintiff alleges that he wrote in his report: "The Unit's Tenure and Promotion Committee, the Chair of the Division[,] and, perhaps, the Dean

of Arts and Sciences were by-passed in the promotion process; thus[,] the Unit did not and does not approve of this promotion[,] nor do <u>we</u> understand how it was justified . . . ." *Id.* (emphases added). Plaintiff alleges that this attempt to call attention to the promotion was to "give citizens, academic and general, critical information on a matter of university and public concern, an administrative action which undermined the legitimacy of the position of full professor and risked subjecting [Delta State University] to accreditation and public perception problems," and that this "was not an action which [Defendant] would routinely perform in the course of writing his annual public report, but rather an attempt to inform the public on a matter having serious implications for the integrity of the institution." *Id.* Plaintiff alleges that then-Provost Ann Lotven emailed an admonishment to Plaintiff complaining that his entry included inappropriate opinion and edited the same. *Id.* ¶ 11(n). Plaintiff further alleges that he complained to Defendant by email about this and Defendant agreed with then-Provost Lotven that some of Plaintiff's language was inappropriate and misplaced. *See id.* ¶ 11(o). Plaintiff avers that he met with Defendant and then-Provost Lotven and that Defendant informed Plaintiff certain comments in the report were " 'inappropriate' because they appeared in a document intended for public view" and further stated: " 'We need to put on our best face; we don't need people on the outside to know this.' " *Id.* Plaintiff alleges that the ultimate result was that this portion of his annual report was "redact[ed] without permission from [Plaintiff]," an acted that "amounted to censorship." *Id.* ¶ 11(n).

As Defendant argues in his motion to dismiss, these allegations describe speech made pursuant to Plaintiff's official duties as university professor and division chair. Documentation attached to the second amended complaint supports that division chairs played a role in appointing faculty at the university, including review and recommendation of faculty candidates. *See* Delta State Univ. Promotion Policies & Procedures for Teaching Faculty [35-2] at 1–3. Furthermore,

24

allegations and attached documentation suggest that annually, division chairs prepared a report to describe their unit and its goals. Pl.'s 2d Am. Compl. [35] ¶ 11(m); Lotven Email to Pl. [35-4] at 1. Unlike the plaintiff in *Givhan*, the Plaintiff in the case *sub judice* was not complaining to his superiors about the school's discriminatory hiring practices and policies, *see* 439 U.S. at 412–17, 99 S. Ct. 693, but was instead challenging a particular promotion made within his department that he felt did not follow the university's normal policies and procedures. In this Court's opinion, the factual scenario is more akin to that in *Caleb v. Grier*, where the plaintiffs' refusals to agree with purportedly false accusations made against a faculty member during interviews directly related to their employment in which the plaintiffs were ordered to take part constituted speech made pursuant to the plaintiffs' official duties. *See* 598 F. App'x at 236. Furthermore, as Defendant urges, the alleged speech—statements made by Plaintiff in a draft of his departmental annual report which Plaintiff prepared as part of his job duties as division chair—represent government speech, which is exempt from First Amendment scrutiny. *See Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 467, 129 S. Ct. 1125, 172 L. Ed. 2d 853 (2009). As government speech, the university division annual report was subject to the discretion of the university. The fact that Plaintiff's annual report, if left unredacted, would have reached persons outside of Delta State University is not sufficient to make it citizen speech. Accordingly, the same is not entitled to First Amendment protection.

Fifth, similarly to the allegations above, Plaintiff alleges that in 2009 he organized an appeal for a faculty member when then-Provost Ann Lotven tried to deny the faculty member's tenure-track contract "even though the contract had been promised to her upon her obtaining her Ph.D. in communications." *See* Pl.'s 2d Am. Compl. [35] ¶ 11(g). Although the Court must make all factual inferences in Plaintiff's favor at the Rule 12(b)(6) stage, Plaintiff does not allege that the

faculty member's tenure-track contract was denied for any discriminatory reason; unlike the plaintiff in *Givhan*, Plaintiff alleges that he challenged a particular action by the university provost in denying a faculty member's tenure-track contract when it was promised to her. As stated above, documentation attached to the second amended complaint suggests that division chairs played a role in appointing faculty at the university, including review and recommendation of faculty candidates. *See* Delta State Univ. Promotion Policies & Procedures for Teaching Faculty [35-2] at 1–3. The Court finds that these allegations concern an issue central to the university and one in which Plaintiff was speaking as part of his official duties as division chair; the speech constituted a report up the chain of command for which there is no First Amendment protection. *See Wilson v. Tregre*, --- F.3d ---, 2015 WL 2457394, at *2 (5th Cir. May 22, 2015) (when chief sheriff deputy relayed concerns about video and audio equipment in interrogation rooms to sheriff and internal affairs, "he was simply reporting potential criminal activity up the chain of command" and "was acting in his official duties as the [c]hief [d]eputy"); *Caleb*, 598 F. App'x at 236 (plaintiffs' refusals to agree with purportedly false accusations made against fellow faculty member during school district-ordered interviews that were allegedly directly related to their employment constituted speech "made within the chain of command" and "related to the employees' jobs, which are both factors . . . previously considered in determining that speech was made as an employee and not as a citizen"); *Wetherbe*, 593 F. App'x at 328 (university professor's speech opposing the idea of tenure "during interviews and other application-related conversations consisted of communications to the individuals responsible for screening and hiring candidates, and his comments were related to an issue of central importance to the operation of the university in which he sought a position of prominence"; thus, the speech "most closely resembled" communications that relate to an employee's own job function up the chain of command and was

not citizen speech). The speech also was not something in which a private citizen who was not a division chair could engage; Plaintiff was participating in internal discussions about operations within the university, and apparently, his own division. *See Paske*, 785 F.3d at 984 (police officer spoke in his capacity as public employee at supervisor meeting to which he was invited in his role as police officer and was required to attend as a part of his job, and during which he spoke in response to an invitation for job-related questions and participated in internal discussions about the department's operations). For many of the same reasons expressed above concerning the previous allegations, these speech allegations are similarly not subject to First Amendment protection.

Sixth, Plaintiff alleges that he voiced strong opposition to various plans to slash the university curriculum during the past three years and that during academic year 2013–2014 he joined about 100 other faculty in co-signing a letter drafted by a faculty member presenting a "passionate defense" of the university curriculum. *See* Pl.'s 2d Am. Compl. [35] ¶ 11(p), (r). Defendant argues in his motion to dismiss that Plaintiff's signature on the letter joining other faculty was inextricably entwined with his role as university professor and division chair, was incidental to his job duties, and plainly owed its existence to the university. Defendant further argues that Plaintiff complained about a proposed curriculum change and opposed course reductions in the course of his university duties and that this speech arose within the scope and control of his employment. In the opinion of this Court, criticism or opposition from a university department chair to the university on an issue within the university—its curriculum—is an example of speech concerning Plaintiff's employment, a relevant factor in the free speech inquiry. *See Caleb*, 598 F. App'x at 236–37; *see also Davis*, 518 F.3d at 313. Also, issues relating to the university curriculum would impact Plaintiff's department within the university; thus, the university curriculum was conceivably a matter in which he was professionally involved as a

division chair. *See Benes*, 2015 WL 900438, at *4. Accordingly, the Court finds that this alleged speech was made within the course of Plaintiff's official duties and is not subject to First Amendment protection.

Seventh, Plaintiff alleges that on October 8, 2013 he sent an email to many faculty members who would be affected by the proposed cuts to the university curriculum, including those outside of his division, asking them to be proactive in opposing the cuts. *See* Pl.'s 2d Am. Compl. [35] ¶ 11(q). In Plaintiff's email, which is attached to his second amended complaint, he apparently recommended that the faculty be proactive in responding to a proposed "plan to 'restructure' the teacher education program in math at Delta State" and attached the proposed plan to eliminate English literature, history, and perspective on society (classes offered by his division) as required core classes for secondary math majors. Pl.'s Email to Faculty [35-6] at 1–2. Defendant argues that Plaintiff is alleging that he complained internally to his coworkers regarding a proposed curriculum change—which is analogous to the alleged speech in *Garcetti*. The Court finds that the alleged action was taken within the university, not publicly, and concerned proposed cuts to the university curriculum, which would conceivably affect Plaintiff's employment as a department chair; it was thus an issue that Plaintiff was professionally involved in as a department chair. *See Benes*, 2015 WL 900438, at *4 (citing *Garcetti*, 547 U.S. at 420–21, 126 S. Ct. 1951). In the opinion of the Court, this action was taken as part of Plaintiff's official duties and is not subject to First Amendment protection.

For all of the foregoing reasons, the Court finds that Plaintiff's allegations in paragraph 11(g), (i), and (k)–(r) must be dismissed for failure to state that Plaintiff engaged in citizen speech on a matter of public concern.

(2) Whether Speech Motivated Adverse Employment Action

The second inquiry asks whether, if Plaintiff has sufficiently alleged that he spoke on a matter of public concern, that "[his] protected speech was a motivating factor in [the adverse employment action]." *See Mooney v. Lafayette Cnty. Sch. Dist.*, 538 F. App'x 447, 454 (5th Cir. 2013) (per curiam) (citing *Beattie v. Madison Cnty. Sch. Dist.*, 254 F.3d 595, 601 (5th Cir. 2001)). That is, Plaintiff "must at least establish that one of the reasons for his [removal from the division chair position] was [his speech]." *Id.* The speech could not have motivated the adverse employment action unless the defendant was aware of it. *See Wetherbe*, 593 F. App'x at 328 (allegations that defendant "was aware of "the alleged] speech" and "that it motivated his actions" are "requirements of [a] claim for First Amendment retaliation"); *Babin v. Breaux*, 587 F. App'x 105, 115 (5th Cir. 2014) (per curiam) (defendant's "knowledge "is key to establishing that [alleged speech was] a motivating factor in [adverse employment action]"; *Aguinaga v. Tex. Alcohol & Beverage Comm'n*, 98 F. App'x 328, 331 (5th Cir. 2004) (per curiam) (defendant was unaware of the alleged speech; it "thus cannot be said to have motivated the termination.").

Temporal proximity between the protected activity and adverse employment action is "one of the elements in the entire calculation of whether [plaintiff] ha[s] shown a causal connection between the protected activity and the [adverse employment action]," *Shirley v. Chrysler First, Inc.*, 970 F.2d 39, 44 (5th Cir. 1992), and "should be viewed in the context of other evidence," *Mooney*, 538 F. App'x at 454. "Close timing between an employee's protected activity and an adverse employment action can be a sufficient basis for a court to find a causal connection required to make out a *prima facie* case of retaliation." *Mooney*, 538 F. App'x at 454 (citing *Evans v. City of Houston, Tex.*, 246 F.3d 344, 354 (5th Cir. 2001)). But "[t]he causal connection prong . . . may also be satisfied when the plaintiff relies upon a chronology of events from which retaliation may

plausibly be inferred." *Id.* (citing *Brady v. Hous. Indep. Sch. Dist.*, 113 F.3d 1419, 1424 (5th Cir. 1997) (footnote and other citations omitted)).

In *Burnside v. Kaelin*, 773 F.3d 624 (5th Cir. 2014), a former deputy sheriff and chairman of a law enforcement political action committee filed a First Amendment retaliation case against the sheriff, alleging that because the plaintiff did not support the defendant's re-election bid, he was punitively transferred and later fired. *Id.* at 625–26. The plaintiff's complaint alleged that the defendant twice told plaintiff that the political action committee should support defendant's reelection bid and threatened to transfer plaintiff's employment if it did not, that it became common knowledge that the political action committee did not support the defendant's bid, that the defendant knew the plaintiff personally supported the defendant's opponent, and that the defendant subsequently transferred the plaintiff's employment. *Id.* at 628. The Fifth Circuit held that "[t]he alleged fact of the causal link is readily apparent for a fact-finder to see" and that "[t]hese allegations are sufficient to allow a plausible inference that [the defendant] knew of the non-endorsement before he initiated [the plaintiff's] transfer and that the non-endorsement caused the . . . transfer." *Id.*

In *Mooney v. Lafayette County School District*, a former assistant school principal alleged, *inter alia*, that the school district did not renew her employment contract because she engaged in political speech over a three-year period. 538 F. App'x at 449. The plaintiff alleged a chronological set of occurrences from 2007 to 2010 that culminated in her termination. *Id.* at 454–55. Specifically, she alleged that in 2007–2008 the school district "suddenly began to criticize her performance immediately after the election but failed to produce any formal disciplinary write-ups detailing Mooney's performance; that in 2008–2009 the school district "tried to demote [plaintiff], for varying reasons, ultimately deciding not to because she protested on the basis of gender

discrimination"; and that in 2009–2010 the school board "terminated her position, when it became convenient to do so." *Id.* at 454–55. The Fifth Circuit held that "[t]his sequence of events is enough . . . to infer retaliatory causation, especially considering that the 'causal link' need only be that her protected activity was one reason motivating [the school board's] decision." *Id.* at 455. The Fifth Circuit further stated "[a]lthough it is true that the ultimate decision to not renew her contract occurred three years after the protected activity, the chain of circumstances outlined . . . began immediately after the election" and was sufficient to demonstrate the causal connection. *Id.*

In the case *sub judice*, the remaining allegations, which may or may not constitute citizen speech on a matter of public concern, nonetheless fail to sustain Plaintiff's First Amendment free speech retaliation claim because Plaintiff has failed to allege the requisite causal link between his alleged speech and the adverse employment action.

Plaintiff's second amended complaint asserts that "[he] was demoted from his position as [c]hair because he championed the rights and welfare of students, faculty, and the public at large— i.e., because he spoke out and rallied against academic cuts, supported by [Defendant]." Pl.'s 2d Am. Compl. [35] ¶ 20. Plaintiff further alleges that "[Defendant], acting in his official capacity as President of Delta State University, set in motion the plan and the execution of the demotion of [Plaintiff] from his position as Chair of the Division of Language and Literature in retaliation for [Plaintiff's] exercise of his Frist Amendment right to speak out as a citizen on matters of public concern" and that the plan is "ongoing." *Id.* ¶ 24. However, noticeably absent from many of Plaintiff's individual speech allegations is a single mention of Defendant—for good reason. Defendant was not employed by Delta State University until April 15, 2013. *See* Def.'s Mem. Br. Supp. Mot. Dismiss [39] at 8 n.48. Also absent from many of the allegations is a mention of any other Delta State University president. In order to state a claim for First Amendment retaliation, a

plaintiff must allege that the defendant was aware of the speech and that it motivated his actions against the plaintiff. *See Wetherbe*, 593 F. App'x at 328; *Babin*, 587 F. App'x at 115; *Aguinaga*, 98 F. App'x at 331. "Without a causal link between the [adverse employment action] and [Plaintiff's] protected activities, there can be no claim of a constitutional violation as a matter of law." *See Burnside*, 773 F.3d at 629. Plaintiff's allegation that his actions "frequently put him at odds with University administrators," Pl.'s 2d Am. Compl. [35] ¶ 10, supports that his actions were known by administrators and may have motivated an adversarial <u>attitude</u> from the administrators as a whole throughout his employment as division chair; however, this does not sufficiently allege that his actions motivated the <u>adverse employment action</u> by Defendant— particularly since Plaintiff fails to allege any disciplinary acts on the part of the administration towards him until the adverse employment action in 2014.

This point is particularly evident when examining the remoteness in time from many instances of alleged speech and the adverse employment action. For instance, the alleged speech in 1990, *see id.* ¶¶ 11(a), (b), occurred twenty-four years before the adverse employment action; the alleged speech in the early 1990s, *see id.* ¶¶ 11(c), (d), occurred at least twenty years before the adverse employment action; the alleged speech in 2000, *see id.* ¶ 11(e), occurred fourteen years before the adverse employment action; the alleged speech in 2007, *see id.* ¶ 11(f), occurred seven years before the adverse employment action; the alleged speech in 2009, *see id.* ¶ 11(g), occurred five years before the adverse employment action; the alleged speech in 2010, *see id.* ¶¶ 11(h)–(j), occurred four years before the adverse employment action; and the alleged speech in 2011, *see id.* ¶¶ 11(k)–(l), occurred three years before the adverse employment action. All of these allegations constitute speech that—even if otherwise cognizable as speech subject to First Amendment protection—is too remote in time from the adverse employment action and not otherwise causally

tied to the adverse employment action. Although temporal proximity is not dispositive on the causation issue, *see Mooney*, 538 F. App'x at 454, even viewed in the context of other evidence, Plaintiff has failed to satisfy the causation element on these particular allegations, *see Burnside*, 773 F.3d at 629 (thirteen-month span between protected activities and adverse employment action not sufficient to show that adverse employment action was causally related to First Amendment conduct).

For all of the foregoing reasons, the Court finds that Plaintiff's remaining allegations—in paragraph 11(a)–(f), (h), (j), and (n)—must be dismissed for failure to show that the alleged speech was a motivating factor in the adverse employment action. The Court further finds that Plaintiff's allegations in 11(a), (i), and (k)–(r) must be dismissed on this additional basis, as well.

Based on all of the foregoing, Plaintiff's second amended complaint in its entirety fails to state a claim for First Amendment free speech retaliation. Accordingly, Defendant's motion to dismiss [38] shall be granted on this ground.

As to the remaining state-law claims for slander, slander per se, false light invasion of privacy, and intentional infliction of emotional distress, the Court declines to exercise supplemental jurisdiction over these claims. A district court may decline to exercise supplemental jurisdiction over a state law claim if "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). "District courts have 'wide discretion' in deciding whether to decline supplemental jurisdiction under [S]ection 1367(c)." *Hicks v. Austin Indep. Sch. Dist.*, 564 F. App'x 747, 748 (5th Cir. 2014) (per curiam). *See Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639, 129 S. Ct. 1862, 173 L. Ed. 2d 843 (2009) ("A district court's decision whether to exercise [supplemental] jurisdiction after dismissing every claim over which it had original jurisdiction is purely discretionary."); *Guzzino v. Felterman*, 191 F.3d 588, 595 (5th Cir.

1999). " 'The general rule is that a court should decline to exercise jurisdiction over remaining state-law claims when all federal-law claims are eliminated before trial.' " *Hicks*, 564 F. App'x at 748 (quoting *Brookshire Bros. Holding, Inc. v. Dayco Prods., Inc.*, 554 F.3d 595, 602 (5th Cir. 2009)); *see Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 351, 108 S. Ct. 614, 98 L. Ed. 2d 720 (1988) ("When the single federal-law claim in the action was eliminated at an early stage of the litigation, the District Court had a powerful reason to choose not to continue to exercise jurisdiction."). Based on the foregoing, the Court finds that it should decline to exercise supplemental jurisdiction over Plaintiff's state law claims. Accordingly, Defendant's motion to dismiss [38] shall be granted on this ground as well, and the state law claims shall be dismissed without prejudice.

## C. Conclusion

In sum, Defendant's motion to dismiss [38] shall be GRANTED; Plaintiff's federal claims shall be DISMISSED; Plaintiff's state law claims shall be DISMISSED WITHOUT PREJUDICE; and this case shall be CLOSED.

An order in accordance with this opinion shall issue this day.

THIS, the 6 day of July, 2015.

Glen H. Davidson

SENIOR U.S. DISTRICT JUDGE